# Exhibit A 4

## to
## Defendant's Notice of Removal

# SCOTT JAY FEDER, P.A.

**ATTORNEY AT LAW**
4649 PONCE DE LEON BOULEVARD
SUITE 402
CORAL GABLES, FLORIDA 33146

SCOTT JAY FEDER *
* BOARD CERTIFIED CIVIL TRIAL LAWYER

TELEPHONE (305) 669-0060
FACSIMILE (305) 669-4220
E-MAIL: scottj8@aol.com

July 16, 2019

CT Corporation System
1200 South Pine Island Road
Plantation, FL 33324

> Re:   Coöperatieve Rabobank, U.A., New York Branch, et al. v. Crowe LLP
>       Miami-Dade County, Florida Circuit Case No. 2019- 018945-CA-01

Dear Sir or Madam:

Pursuant to agreement with John Barber, general counsel for Crowe LLP we are providing a copy of the attached Complaint by mail to CT Corporation, as registered agent of Crowe LLP.

Sincerely yours,

Scott Jay Feder

/ib
Enclosure
cc    John J. Barber, Esq., Assistant Gen. Counsel/Crowe LLP
      Andrew Solomon, Esq.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.:

COÖPERATIEVE RABOBANK    :
U.A, NEW YORK BRANCH,
BROWN BROTHERS HARRIMAN :
& CO., BANK HAPOALIM B.M.,
MITSUBISHI INTERNATIONAL    :
CORPORATION, ICBC
STANDARD BANK PLC,          :
TECHEMET METALTRADING,
LLC, WOODFOREST NATIONAL:
BANK and HAIN CAPITAL
INVESTORS MASTER FUND, LTD:,

Plaintiffs,

v.

CROWE LLP,

Defendant.                              /

## COMPLAINT

Plaintiffs Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers

Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International

Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading, LLC

("Techemet"), Woodforest National Bank ("Woodforest") and Hain Capital Investors Master

Fund, Ltd. ("Hain Capital"), as successor to Bank Leumi USA ("Leumi"), by and through their

undersigned attorneys, for their Complaint against Defendant Crowe LLP ("Crowe"), allege as

follows:

## NATURE OF THE CASE

1.    Plaintiffs provided secured credit facilities and associated loans and precious metal

leases to Republic Metals Corporation ("Republic"), a precious metals refiner based in Opa Locka, Florida. They bring this lawsuit against Republic's former auditor, Defendant Crowe, to recover damages caused by the inaccurate audit reports issued by Crowe for Republic's 2014 and 2015 financial statements. Crowe issued these opinions knowing that they would be used and relied upon by Republic's creditors, including Plaintiffs. Republic's 2014 and 2015 financial statements, which Crowe audited, represented that Republic had precious metals inventory valued at $97 million and $154 million, respectively. In fact, those numbers were a fiction and the value of Republic's actual inventory was a fraction of the amounts represented.

2. In conducting its audit, Crowe knew that Republic's inventory valuation was based on several thousand barrels of hydroxide—a refinery byproduct—that purportedly contained millions of dollars of extractable silver and gold. This inventory was, by orders of magnitude, the most significant asset on Republic's balance sheet. For an auditor, high-value inventory items always merit scrutiny, but this is especially so when each unit of inventory, here, a barrel of hydroxide sludge, differs in value and composition from unit to unit. But Crowe, evidently lacking the requisite industry knowledge and in derogation of Generally Accepted Audit Standards ("GAAS"), accepted Republic's counts and valuation methodologies at face value, without conducting independent testing or other assurance procedures, and with no indication that Republic had adequate accounting controls for tracking and recording inventory. Crowe did so, even though there were numerous red flags that should have alerted it that Republic's inventory values were wildly overstated.

3. In extending credit to Republic, Plaintiffs relied on Crowe's professional audit opinions, including that Republic's 2014 and 2015 financial statements fairly presented, in all material respects, Republic's financial position and results of operations and that they were

prepared in accordance with Generally Accepted Accounting Principles. Neither was true. Had Crowe exercised due professional care and the requisite degree of professional skepticism, Republic's misstatements and errors would have been easily detected. Indeed, its "audit" amounted to no audit at all and its procedures apparently were no more thorough than checking arithmetic. When an auditor ignores obvious risks and utterly abandons the guidelines and principles that govern the profession, its negligence amounts to gross negligence, and that is how Crowe's performance must be viewed here.

4.      In November 2018, Republic filed for Chapter 11 bankruptcy as a result of what Republic described as "a significant discrepancy in its inventory accounting." As of that date, Republic owed the Plaintiffs over \$177 million under loans and metal leases, which it could not repay. These amounts remain unpaid as of today.

5.      This complaint brings claims for negligent misrepresentation, for gross negligence, and for violations of Florida's Deceptive or Unfair Trade Practices Act.

## PARTIES

6.      The Plaintiffs are a group of financial institutions and precious metals lessors that extended nearly \$200 million in credit to Republic pursuant to certain secured credit and lease agreements.

7.      Plaintiff Rabobank is a foreign branch office of a financial institution incorporated and existing under the laws of the Netherlands with its principal place of business located as 245 Park Avenue, New York, New York 10167.

8.      Plaintiff BBH is a New York limited partnership with its principal place of business located at 140 Broadway, New York, New York 10005.

9.      Plaintiff Hapoalim is a foreign branch office of a financial institution incorporated

3

and existing under the laws of Israel with its principal place of business in the United States located at 1120 Avenue of the Americas, New York, New York 10036.

10.     Plaintiff Mitsubishi is a New York corporation with its principal place of business located at 655 Third Avenue, New York, New York 10017.

11.     Plaintiff ICBCS is a corporation incorporated and existing under the laws of England and Wales with its principal place of business located at 20 Gresham Street, London, EC2V 7JE, United Kingdom.

12.     Plaintiff Techemet is a Texas corporation with its principal place of business located at 6025 Genoa Red Bluff Road, Pasadena, Texas 77507.

13.     Plaintiff Woodforest is a national banking association with its principal place eof business located at 1330 Lake Robbins, Suite 100, The Woodlands, Texas 77380.

14.     Leumi is a New York chartered bank with its principal place of business located at 579 Fifth Avenue, New York, New York 10017. Plaintiff Hain Capital purchased Leumi's rights, claims, and privileges arising in connection with Republic's obligations to Leumi.  Hain Capital is organized under the laws of the Cayman Islands, with its principal place of business located at 301 Route 17, 7th Floor, Rutherford, New Jersey 07070.

15.     Defendant Crowe, formerly known as Crowe Horwath LLP, is a national accounting firm with offices around the country, including offices in Fort Lauderdale, Tampa, and at 1395 Brickell Avenue, Miami, Florida 33131.   Crowe is a member of the Swiss verein (association) Crowe Global.

## JURISDICTION AND VENUE

16.     This Court has general subject matter jurisdiction because this is a civil dispute involving more than $50,000.  It has personal jurisdiction over Defendant Crowe under Florida's

4

long-arm statute, Fla: Stat. § 48.193(1)(a)(2), because a substantial part of the conduct at issue, including Crowe's audits and its misrepresentations in audited financial statements, occurred in Florida. Venue is proper in this Circuit under Fla. Stat. § 47.011, because Crowe has an office located in Miami-Dade County.

## FACTUAL BACKGROUND

### Republic Metals Corporation

17. Republic, incorporated in the State of Florida in 1980, was in the business of refining, selling, and brokering precious metals. The company was family-owned and was operated by Chief Executive Officer Jason Rubin. Its Chief Financial Officer was David Comite. Republic acquired minimally processed gold and silver and processed it into finished metal at its refinery located in Opa Locka, Florida. Both Rubin and Comite worked out of Republic's offices at the refinery site.

18. In its early days, Republic primarily refined gold, but in 2013 it shifted its focus to silver. The process for refining gold and silver is not the same. Gold involves melting, whereas silver is mainly a chemical process. Moreover, the silver refining process takes longer and the process involves a much larger volume of raw materials. A byproduct from the silver refining process is a sludge, which contains the remnants from the refining process, mainly water, copper, and various quantities of precious metals that were not extracted through the main refining process.

19. As Republic ramped up its silver-refining operations, it generated substantial quantities of the hydroxide byproduct, which it stored in barrels. These barrels of hydroxide sludge were recorded on Republic's balance sheet as inventory. The inventory amounts were significant: In 2014, Republic reported an inventory valuation of $97 million (out of total current assets of $175 million) and, in 2015, the inventory valuation was $154 million (out of total current assets

5

of $233 million.

20.    Republic obtained working capital for its operations through precious metal leases and loans provided under the Intercreditor credit facilities further described below. These credit facilities were secured by Republic's purported precious metals inventory.

**Crowe's Negligent Audit of Republic's Precious Metals Inventory**

21.    In December 2014, Republic engaged Crowe in Florida to audit Republic's 2014 financial statements. The audit was led by Crowe partner Justin Stone, based in Crowe's Fort Lauderdale office. The Crowe engagement agreement was addressed by Crowe's Fort Lauderdale office to Republic's CFO David Comite at Republic's office in Miami, and was signed by Florida-based Crowe partner, Timothy Iszler, who is the head of Crowe's Miami office today.

22.    In auditing Republic's 2014 results, on information and belief, Crowe conducted no material audit procedures and obtained no audit evidence, or none of substance, supporting Republic's valuation of its inventory. Essentially, Crowe appears to have taken Republic's number at face value.

23.    In designing and conducting the audit, however, inventory should have been a major focus. This is so for several reasons under GAAS. As a general matter, observation of inventory counts is a mandatory component of an audit and the valuation of inventory is always a key part of an audit because of its materiality and the high risk of errors or misstatements. At Republic, further scrutiny was required because its reported inventory value represented such a large proportion of the overall value of the current assets on the balance sheet. Thus, from an audit perspective, inventory at Republic was a high-risk item, warranting close attention.

24.    Internal Republic records show, however, that Crowe paid little or no attention to Republic's claimed inventory value in the 2014 audit, but instead relied solely on management.

6

On April 17, 2015, Republic sent Crowe a summary of Republic's inventory as of December 31, 2014, prepared by Republic CFO David Comite. The summary purported to record Republic's inventory by location and type. The largest line item in Comite's inventory summary was denoted "refinery" inventory. The refinery inventory line was supposed to reflect metal inventory that was at some stage of processing in the refinery at Opa Locka. According to Comite's summary, as of December 31, 2014, the refinery held 5,092,154 troy ounces of silver and 9,200 troy ounces of gold. The reported value of those metals as of December 31, 2014 was approximately $81.3 million in silver and $11 million in gold for a total of $92.3 million.

25.     On June 24, 2015, Crowe issued a clean audit opinion for Republic's financial statements for the fiscal year ending December 31, 2014. Crowe summed up its audit work as follows: "In our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of Republic … as of December 31, 2014, and the results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America." The statements represented *total* inventory value of $97 million. The purported gold and silver inventory in the refinery (*i.e.*, $92.3 million) thus accounted for the vast bulk of the $97 million total inventory reported in the audited financial statements.

26.     The value of Republic's refinery inventory was not close to $92.3 million and was, on information and belief, worth no more than $10 million. Republic's documents and records contain no indications that Crowe ever requested the basis for the $92.3 million of refinery inventory that Comite included in his 2014 inventory summary and that composed the bulk of the overall reported inventory amount.

27.     Had Crowe merely insisted on backup documentation from Comite for the

7

inventory valuation, it would have discovered that the figure was unsubstantiated and unreliable. This is because Republic's records show that while Comite had documented support for all the inventory line items in his 2014 inventory summary, he had none for the $92.3 million in refinery inventory.

28.     In any event, an auditor must do more than just ask management for backup for $92.3 million of claimed inventory. Had Crowe tested the inventory and had it insisted on obtaining substantial independent audit evidence to support Republic's inventory valuations, it would have determined that the inventory values were overstated and could not be relied upon. But, on information and belief, and informed by review of Republic's records, Crowe conducted no testing, did not observe the inventory count, and neither sought nor obtained audit evidence to corroborate Comite's calculation of $92.3 million in 2014 refinery inventory.

29.     For the 2015 audit, Crowe did make some inquiries about inventory valuations, but the answers should have raised red flags for Crowe about the integrity of Republic's inventory numbers. Yet Crowe failed to react.

30.     In response to Crowe's questions, Rubin and Comite represented that the value of the purported refinery inventory was made up principally of silver (approximately $136 million) and a smaller quantity of gold (approximately $18 million), which were contained in barrels of "hydroxide." Crowe should have immediately recognized that these valuations were logically, if not physically impossible.

31.     Hydroxide, as noted above, is not a barrel of pure silver or gold, but a chemical sludge produced as a byproduct of the refining process, which can contain *residual* amounts of precious metals mixed among large amounts of copper and other residues, including some that are toxic. Republic claimed to have 2,493 barrels of this hydroxide sludge with a total value of

8

approximately $154 million, meaning that the average value per barrel was $61,772.96.

32.     As evidence of the purported precious metal content of the hydroxide barrels, Republic provided Crowe with lists of so-called "clean-up bars." A clean-up bar, in Republic's nomenclature, is a numbered lot of metal that has been recovered from refining byproducts or refinery equipment and melted into bars. The lists Republic provided to Crowe gave details of the assayed gold and silver content, by weight and by percentage, for each of 37 clean-up bars. Republic's contention was that these clean-up bars represented the quantity of metal that had been recovered from hydroxide sludge barrels in the past and could serve as a proxy for recoveries from the remaining inventory. Using the 37 clean-up bars from Comite's lists, Crowe attributed an average silver content of 3,936.9 troy ounces (or 270 pounds) to each hydroxide barrel in inventory.

33.     In addition to the list of clean-up bars, Comite also provided Crowe with a spreadsheet of calculations that set out his methodology for establishing the precious metal contents of the hydroxides. In these calculations, Comite valued the hydroxides by multiplying (x) the average content, by weight, of gold and silver in the 37 clean-up bars, by (y) the number of barrels of hydroxides. The result of this calculation, according to Comite, was the total weight of recoverable gold and silver in the hydroxide barrels.

34.     Had Crowe exercised the appropriate level of auditor skepticism, it would have readily detected the errors in Republic's assumptions and methodologies.

35.     First, at the highest level, an auditor knowledgeable in the industry, as Crowe was required to be, would have known that it was implausible that a single barrel of hydroxide sludge could be worth $61,772.96.

36.     Second, Crowe had to obtain a reasonable assurance that the average content and

9

weight of the clean-up bars was a reasonable proxy for the expected extraction of precious metals from each barrel in inventory. On this point, not only did Crowe fail to employ an appropriate test (*e.g.*, randomly sampling barrels and having them tested independently), but it ignored evidence obtained from Republic that showed that the inference that one clean-up bar represented the expected precious metal extraction from a single barrel was completely false and physically impossible. As noted above, Comite provided data to Crowe showing that the average clean-up bar contained 271 pounds of precious metal. The data also showed that the most valuable clean-up bar had an assayed silver content of 7,579.2 troy ounces, or almost 519 pounds. A typical barrel of hydroxide weighs between 300 to 500 pounds, of which precious metals comprised a small component.' Given these figures, the 1:1 ratio of a clean-up bar to a barrel, as implied from Comite's calculations, was simply impossible. To be correct, the barrels of hydroxide sludge would have had to have contained mostly (or entirely) precious metals and little of the other components, when just the opposite was the case.

37.     In addition to the physical improbability (or impossibility) of Republic's inventory accounting, Crowe received other substantial indications that Republic's inventory valuations were questionable, if not fraudulent. For instance, over the course of the year, the number of hydroxide barrels in Republic's inventory changed, but their calculated value remained the same. Republic maintained this constant overall inventory value despite a fluctuating inventory by altering the "average value" per barrel. Crowe saw these manipulations but, on information and belief, made no substantial inquiries about them.

38.     Crowe also saw direct evidence of Republic's manipulation of its inventory counts and valuations. For instance, when Crowe visited the refinery in December 2014, Crowe worked with a Republic employee to identify 1,800 to 1,900 hydroxide barrels.   When Comite

10

subsequently provided his inventory calculation to Crowe, he used a figure of 5,000 barrels, and assumed a silver content of 2,000 troy ounces per barrel. When Crowe asked Republic to verify the 5,000-barrel count, Rubin and Comite reported that the figure had only been an estimate, and that they had personally conducted a new count subsequently and now calculated total barrels as of December 31, 2014 at only 2,493. With the number of barrels dropping from 5,000 to 2,493, logically, the total inventory value should have decreased by the same proportion. But Republic maintained the value constant by doubling its estimate of the expected recovery of precious metals from each barrel to 3,936.9 troy ounces per barrel, even though that was twice the estimate that Comite had previously used when calculating the value of 5,000 barrels. Thus, Republic cut its barrel count by half, but reported no significant change in the purported total value of the contents of the barrels. Had Crowe followed basic audit principles, as required under GAAS, Republic's changes in valuation assumptions would have been examined, tested, and validated (or debunked). But Crowe took no such steps.

39.     On July 5, 2016, Crowe issued a clean audit opinion for Republic's financial statements for the fiscal year ending December 31, 2015. The 2015 audited financial statements falsely represented that Republic had inventory with a total value of $154,384,448. Most of the $154 million inventory consisted of the purported refinery inventory, *i.e.*, the hydroxide sludge, which had a true value, on information and belief, of no more than $10 million.

40.     In issuing a clean audit opinion for Republic's financial statements for 2014 and 2015, Crowe breached the duty of care to which accounting professionals are held in conducting independent audits. Crowe's auditors had insufficient knowledge of the industry and of the specific inventory that they were auditing to evaluate the information provided by Republic; they failed to conduct appropriate inquiries or obtain appropriate documentation to support the

11

inventory valuation and inventory controls; they failed to obtain advice from an industry expert on how to value the hydroxides; they failed to follow an auditor's duty of skepticism; they failed to ensure that Republic had adequate accounting controls in place for inventory; all despite the materiality of the inventory at issue and the numerous red-flag warnings that Republic's information and representations were false and fraudulent.

**The Intercreditor Lenders' Reliance on Crowe's Audits**

41. From December 2014 on, Republic funded its working capital needs by drawing on credit facilities governed by an Intercreditor Agreement between Republic and a group of Intercreditor lenders.

42. The Intercreditor Agreement provided the common framework for financial institutions to extend secured credit facilities to Republic. The Intercreditor Agreement defined a common borrowing base for the Intercreditor facilities and required Republic to provide a Borrowing Base Report at regular intervals. The agreement defined the borrowing base as "an amount equal to the sum of certain asset categories of [Republic] (principally accounts receivable and inventory)." The Intercreditor Agreement also enabled Intercreditor lenders to share equally in all collateral securing Intercreditor facilities and in all recoveries obtained by any Intercreditor lender.

43. The Intercreditor Agreement contemplated that some lenders would potentially terminate their participation in the Intercreditor group and that others would join from time-to-time. It provided expressly that "[a]ny bank or financial institution which is not a party to this Agreement initially may, with the consent of each of the other Creditors, become a party hereto and hereafter be deemed a Creditor hereunder." Members of the Intercreditor group extended credit to Republic in the form of cash loans or precious metals leases.

12

44.     The Intercreditor Agreement was amended from time to time, but at all relevant times contained the provisions discussed in paragraphs 42 and 43.

45.     The parties to the Amended and Restated Intercreditor Agreement, dated as of December 31, 2014, included Plaintiff Mitsubishi and other lenders.

46.     Mitsubishi received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in continuing to enter into leases of gold and silver to Republic after June 24, 2015.   At the time of Republic's bankruptcy petition, Republic owed Mitsubishi approximately $54,278,000 under the Intercreditor Agreement metal leases.

47.     On February 19, 2016, the Intercreditor Agreement was amended and restated to, among other things, add Plaintiff Hapoalim as a party.  It was a requirement of the Hapoalim credit facility that Republic provide the bank with copies of its annual audited financial statements within 150 days of the close of each fiscal year, "prepared by independent public accountants reasonably acceptable to the Bank."

48.     Hapoalim received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor credit facilities with Republic and lending money to Republic pursuant to the Intercreditor credit facilities.   At the time of Republic's bankruptcy petition, Republic owed Hapoalim approximately $11,373,000 in Intercreditor Agreement loans.

49.     On March 24, 2016, Plaintiff ICBCS became a party to the Intercreditor Agreement.

50.     ICBCS received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor Agreement credit facilities with Republic and leasing metal to Republic pursuant to the credit facilities. At the time of Republic's bankruptcy petition, Republic owed ICBCS approximately $20,034,000 under Intercreditor Agreement metals

13

leases.

51.     On June 24, 2016, Plaintiff BBH became a party to the Intercreditor Agreement and extended credit facilities to Republic. It was a requirement of the BBH credit facility that Republic's annual financial statements be "audited by Crowe Horwath or a firm acceptable to the Bank" and provided to BBH within 150 days of the end of each fiscal year.

52.     BBH received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor credit facilities with Republic and in lending money to Republic pursuant to these credit facilities. At the time of Republic's bankruptcy petition, Republic owed BBH approximately $9,098,000 under Intercreditor Agreement loans.

53.     On June 27, 2017, Plaintiff Rabobank became a party to the Intercreditor Agreement and entered into a credit facility with Republic. It was a requirement of the credit facility that Republic deliver copies of its audited financial statements to Rabobank within 150 days of the fiscal year end.

54.     Rabobank received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor credit facilities with Republic and in lending money to Republic pursuant to these credit facilities. At the time of Republic's bankruptcy petition, Republic owed Rabobank approximately $31,730,000 under Intercreditor Agreement loans.

55.     On June 27, 2017, Plaintiff Techemet became a party to the Intercreditor agreement and entered into metal leasing agreements with Republic. It was a requirement of the agreements that Republic deliver copies of its annual audited financial statements to Techemet.

56.     Techemet received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor leasing agreements with Republic and,

14

pursuant to them, leasing metals to Republic. At the time of Republic's bankruptcy petition, Republic owed Techemet approximately \$14,477,000 under Intercreditor Agreement metals leases.

57.    On October 31, 2017, Woodforest became a party to the Intercreditor agreement and entered into credit facilities with Republic. It was a requirement of the credit facilities that Republic deliver copies of its audited financial statements to Woodforest within 150 days of the fiscal year end.

58.    Woodforest received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor credit facilities with Republic and in loaning money to Republic pursuant to those facilities. At the time of Republic's bankruptcy petition, Republic owed Woodforest approximately \$13,648,000 under Intercreditor Agreement loans.

59.    On October 31, 2017, Leumi became a party to the Intercreditor Agreement and entered into Intercreditor credit facilities with Republic. It was a requirement of the credit facilities that Republic deliver copies of financial statements to Leumi within 150 days of the fiscal year end.

60.    Leumi received, reviewed, and relied on Crowe's audits of Republic's 2014 and 2015 financial statements in entering into Intercreditor credit facilities with Republic and in loaning money to Republic pursuant to those facilities. At the time of Republic's bankruptcy petition, Republic owed Leumi approximately \$22,746,000 under Intercreditor Agreement loans.

**Crowe's Duties to The Intercreditor Lenders**

61.    As Republic's auditor, Crowe knew that Republic depended on the Intercreditor facilities described above, and that Republic would be providing Republic's audited financial

15

statements to Intercreditor lenders.

62.     The 2014 and 2015 audited financial statements discuss Republic's outstanding loans and metal leases as of December 31, 2014 and 2015 respectively. The documentation for the loans and metal leases discussed in the financial statements cross-references the Intercreditor Agreement, which Republic had sent to Crowe during Crowe's first audit. The audited financial statements also summarize the Intercreditor Agreement's borrowing base and the associated limitations on Republic's total borrowings. Specifically, the 2014 audited financial statements note that "The Company's borrowings under its agreements with the financial institutions are subject to a credit facility. Total borrowings cannot exceed 90% of the market value of its inventory and advances, or 90% of its accounts receivable." The 2015 audited financial statements repeat this language except that they describe "The Company's borrowing under its agreements with the financial institutions" as "subject to a borrowing base" rather than "subject to a credit facility."

63.     Correspondence between Republic and Crowe during the 2016 audit shows that Republic had multiple discussions with Crowe regarding the fact that Republic needed Crowe to complete the audit so that Republic could provide the audited financial statements to its creditors:

- On May 26, 2016, Tom Foreman, a Crowe auditor, informed Comite via email that Crowe would not be able to issue financial statements in sufficient time to comply with covenants in a loan agreement with BNP Paribas, which was, at that time, an Intercreditor lender.

- On May 29, 2016, in correspondence with Comite relating to obtaining a waiver of the financial statements covenant, Foreman referred to "other agreements" that he believed, incorrectly, did not contain "a reporting requirement" similar to the

16

BNP Paribas covenant, but noted that "we [Crowe] will continue to proceed as quickly as possible regardless."

- On June 6, 2016, Comite emailed audit partner Justin Stone asking for a call and stating, "As you know our banks are eager to receive the report."

- On June 6, 2016, Rubin emailed Justin Stone emphasizing that "I do not want to be in default because of late financial reporting."

- On June 10, 2016, Comite emailed an associate at Crowe asking for a call and stating, "I'd like to answer your questions today as Jason needs to give the fin stmts to banks asap."

- On June 16, 2016, Comite asked Foreman to please complete a discussion of certain outstanding issues "so that we can have the stmts finalized this week (Jason [Rubin] is telling me that our banks have been requesting them)."

64.    Thus, Crowe knew that Republic would share the audited financial statements with financial institutions providing credit or similar lending arrangements, including specifically institutions that were providing those facilities under the Intercreditor Agreement. Because of that knowledge, Crowe had a duty of care to the financial institutions and precious metals lessors that joined the Intercreditor Agreement and provided credit to Republic in accordance with its terms (including each Plaintiff), which it breached in issuing a clean audit for the financial statements described above.

**Republic's Bankruptcy**

65.    Republic changed auditors after its 2015 audit. Eisner Amper LLP audited Republic's 2016 financial statements. For reasons that are still unaccounted for, Republic substantially reduced the value of its inventory as of December 31, 2017. Republic never issued

17

audited financial statements for 2017, and the reduction in inventory value ultimately led to Republic's default under its agreements with Intercreditor lenders and to Republic's bankruptcy.

66.     Republic filed voluntary petitions for bankruptcy relief on November 2, 2018. At the time of the petition, Republic owed more than $177 million to the Plaintiff lenders who had relied on Crowe's audits.

## COUNT I
### *Negligent Misrepresentation*

67.     Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 66 as though set forth here in full.

68.     Crowe issued unqualified audit opinions on Republic's financial statements for 2014 and 2015 that falsely represented Republic's financial condition, including the value of Republic's inventory. These misrepresentations were material to Republic's financial condition and to persons relying on the audited financial statements.

69.     Crowe should have known that the inventory valuation was false and Crowe failed to exercise reasonable care and to conduct reasonable inquiries, as would be expected of an independent auditor under the circumstances, to ensure that the valuation was reasonably accurate.

70.     Crowe knew that Republic would transmit the 2014 and 2015 audited financial statements to the creditors in general and, specifically, to the financial institutions and precious metals lessors that were providing Republic with credit facilities, loans, and metal leases under the Intercreditor Agreement, which include Plaintiffs, and thus expected and intended that the audited financial statements would reach and would influence such financial institutions and precious metals lessors.

71.     Plaintiffs received and justifiably relied on Republic's 2014 and 2015 audited financial statements.

72.     Plaintiffs relied on the misrepresentations in the audited 2014 and 2015 financial statements to their detriment in lending money and leasing metal to Republic based on materially false representations of Republic's financial condition and its compliance with covenants.  But for the misrepresentations of Republic's financial condition in the audited 2014 and 2015 financial statements, Plaintiffs would not have extended these loans and leases to Republic, and would have terminated any outstanding loans or leases.

73.     As a result of their reliance on the audited financial statements, Plaintiffs have been injured in an amount in excess of $57 million.

## COUNT II
### *Gross Negligence*

74.     Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 73 as though set forth here in full.

75.     Crowe's negligence was so extreme that it constituted a reckless indifference to the rights of others and, particularly, Plaintiffs, who loaned and leased millions of dollars and precious metals in reliance on the accuracy and validity of Republic's audited financial statements.

76.     Crowe knew that Plaintiffs, who were extending credit to Republic based on a "borrowing base," for which inventory was a major component, would be relying on financial statements audited by Crowe.

77.     Crowe's reckless indifference included, among other grossly negligent acts and omissions, its issuance of a clean audit opinion for Republic's 2014 financial statements without making any reasonable or discernable effort to assure that Republic had fairly and accurately valued the largest and most material asset on its balance sheet, the inventory, or that Republic had adequate internal controls to assure the accuracy of management's accounting for inventory.

78.     Crowe's reckless indifference also included, among other grossly negligent acts

19

and omissions, its issuance of a clean audit opinion for Republic's 2015 financial statements without conducting a proper inventory audit and by accepting valuations issued by Republic, without testing, which were either impossible or contradicted by other information obtained by Crowe about the inventory, and without ascertaining that Republic had adequate controls to assure the accuracy of management's accounting for inventory.

79.     Crowe's reckless indifference also included, among other grossly negligent acts and omissions, its failure to obtain a basic understanding of Republic's business and the precious metals refining industry before taking on an audit assignment.

80.     Plaintiffs justifiably relied on Crowe's audit of Republic's financial statements in agreeing to extend credit to Republic and to do so on a secured lending basis.

81.     As a result of their reliance on the audited financial statements, Plaintiffs have been injured in an amount in excess of $57 million.

**COUNT III**
*Violation of Florida Deceptive or Unfair Trade Practices Act*

82.     Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 81 as though set forth here in full.

83.     Crowe's audit reports for Republic's 2014 and 2015 financial statements constituted a deceptive act or unfair trade practice under Florida's Deceptive or Unfair Trade Practices Act ("FDUTPA").

84.     Crowe's deceptive audit reports and unfair trade practices induced Plaintiffs to loan and lease millions of dollars and precious metals to Republic through secured credit facilities that were based, in large part, on the false assurance that Crowe's reported inventory valuations were accurate and had been verified by a prominent audit firm.

20

85.    Plaintiffs suffered actual damage as a proximate result of Crowe's deceptive acts and unfair trade practices in an amount in excess of $57 million.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request judgment on their Complaint as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be determined at trial.

B.    Awarding Plaintiffs actual damages, plus attorney's fees and court costs under the FDUTPA.

C.    Awarding Plaintiffs such other or additional relief as the Court finds to be just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated:      June 24, 2019                    Respectfully submitted,

Andrew T. Solomon
Attorney at Law
Solomon & Cramer LLP
1441 Broadway, Ste. 6026
New York, NY 10018
asolomon@solomoncramer.com
(c) (917) 664-5575
(dd) (646) 518-7822
(main) (212) 884-9102
(f) (516) 368-3896

and

SCOTT JAY FEDER, P.A.
Attorneys for Plaintiff
4649 Ponce de Leon Blvd., Suite 402
Coral Gables, Florida 33146
Telephone:    (305) 669-0060
Facsimile:    (305) 669-4220
E mail:       scottj8@aol.com
assistantscottjfeder@hotmail.com

By:/s/Scott Jay Feder
         Scott Jay Feder
         Florida Bar No.: 0359300

22